**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

SCOTT R. NAPPER, *Administrator*
*of the Estate of Joshua Napper*,

                Plaintiff,

v.                               CIVIL ACTION NO.  5:18-cv-00286

UNITED STATES OF AMERICA,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the *Motion of the United States to Dismiss this Civil Action* (Document 7), *the Memorandum in Support of the Motion of the United States to Dismiss* (Document 8-1), *Plaintiff's Memorandum in Opposition to Motion to Dismiss* (Document 14), the *Reply Memorandum in Support of the Motion of the United States to Dismiss this Civil Action* (Document 16), the *Motion to Amend Complaint, Instanter* (Document 17) and accompanying *Amended Complaint* (Document 17) as well as the attached exhibits, and the *Memorandum of the United States in Opposition to Plaintiff's Motion to Amend Complaint, Instanter* (Document 21). For the reason stated herein, the Court finds that the motion to amend should be granted and the motion to dismiss should be denied.

## FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

The statement of facts set forth below is taken from the Plaintiff's amended complaint and supporting exhibits.[1] The Plaintiff, Scott Napper, Administrator of the Estate of Joshua Napper, deceased, filed a one-count amended complaint against the Defendant, the United States of America, pursuant to the Federal Tort Claim Act (hereinafter "FTCA") 28 U.S.C § 1346(b). Joshua Napper, along with 28 other miners, died on April 5, 2010, at the Upper Big Branch Mine (hereinafter "the Mine") due to an explosion.[2] After the explosion, the Mine Safety and Health Administration (hereinafter "MSHA") began investigating its cause. MSHA determined that on a longwall face, methane ignition at the Mine transitioned into a small methane explosion that propagated into a massive coal dust explosion and the deadliest U.S. coal mine disaster in nearly forty years.

MSHA also reviewed its conduct in the period leading up to the fatal accident. The investigation revealed that MSHA inspectors violated mandatory regulations which created, maintained, or contributed to unsafe working conditions including the violations before and including those cited in the March 6, 2012 Internal Review of MSHA's actions at the Mine. For example, according to the report, in violation of the General Coal Mine Inspection Procedures and Inspection Tracking System Handbook, some parts of the mine were not inspected during the previous six regular inspections, fire protection equipment inspections were not conducted or

---

1 As a matter of right, pursuant to Federal Rules of Civil Procedure 15(a)(1)(B), the Plaintiff can amend his pleading once as a matter of course within twenty-one days after service of the motion under Rule 12(b). Here, the Defendant served the Plaintiff with a motion to dismiss on May 11, 2018, and the Plaintiff filed an amended complaint on June 1, 2019. Therefore, the Court relies on the amended complaint as the operative complaint for the purpose of reviewing the motion to dismiss.

2 In the year prior to the explosion, the Mine was issued more 104(d) citations and orders than any other mine in the nation.

documented, checks for imminent dangers were not conducted and self-contained self-rescue devices were not properly inspected. Moreover, inspection trainees conducted some inspections.

The Plaintiff, the father of the deceased, instituted this action on February 9, 2018. The sole count of the complaint asserts claims for negligence and wrongful death under West Virginia law. The Plaintiff alleges that "the United States is liable here for negligently executing a duty it undertook, and for failing to exercise reasonable care to prevent harm to Joshua Napper caused by the United States' affirmative negligent conduct." (Compl. ¶32).

On May 11, 2018, the Defendant moved to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The United States contends that (1) the Plaintiff's claims are barred by the sovereign immunity of the United States, (2) the Court lacks subject matter jurisdiction under the FTCA, because the Plaintiff's claims are barred by the discretionary function exception, (3) the Court lacks subject matter jurisdiction because the United States has not waived sovereign immunity under the FTCA to allow tort claims based on alleged violations of federal law, and (4) the Plaintiff's claims are based on alleged violations of the Mine Act, and federal law does not recognize a private right of action for alleged violations of the Mine Act.

On May 25, 2018, the Plaintiff filed a memorandum in opposition to the motion to dismiss and on June 1, 2018, filed a motion to amend the complaint and attached the amended complaint. On June 1, 2018, the Defendant filed a reply memorandum in support of its motion to dismiss. Finally, on June 16, 2018, the Defendant filed a memorandum opposing the Plaintiff's motion to

amend the complaint, wherein it argued that the amendments were not sufficient to defeat its motion to dismiss.[3]

## STANDARD OF REVIEW

*A. Motion to Dismiss- 12(b)(1)*

A motion to dismiss pursuant to Rule 12(b)(1) raises the fundamental question of whether a court is competent to hear and adjudicate the claims brought before it. "In contrast to its treatment of disputed issues of fact when considering a Rule 12(b)(6) motion, a court asked to dismiss for lack of jurisdiction may resolve factual disputes to determine the proper disposition of the motion." *Thigpen v. United States*, 800 F.2d 393, 396 (4th Cir. 1986), rejected on other grounds, *Sheridan v. United States*, 487 U.S. 392 (1988) (but explaining that a court should accept the allegations in the complaint as true when presented with a facial attack that argues insufficiency of the allegations in the complaint). Reasonable discovery may be necessary to permit the party seeking jurisdiction to produce the facts and evidence necessary to support their jurisdictional allegations. *Id.* The party seeking jurisdiction also has the burden of proving that subject matter jurisdiction exists. *See Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). Dismissal for lack of subject matter jurisdiction is proper only if there is no dispute regarding the material jurisdictional facts and the moving party is entitled to prevail as a matter of law. *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999).

*B. Motion to Dismiss- 12(b)(6)*

---

3 Since the Defendant has not contested material jurisdictional facts to support its motion pursuant to Rule 12(b)(1), the Court has construed the facts and allegations in the complaint (which may be further developed through discovery) as true, in accordance with the applicable standards for consideration of Rule 12(b)(1) and 12(b)(6) motions.

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted tests the legal sufficiency of a complaint or pleading. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Additionally, allegations "must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Moreover, "a complaint [will not] suffice if it tenders naked assertions devoid of further factual enhancements." *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

The Court must "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). The Court must also "draw [] all reasonable factual inferences from those facts in the plaintiff's favor." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). However, statements of bare legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a claim. *Iqbal*, 556 U.S. at 679. Furthermore, the court need not "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements,

do not suffice . . . [because courts] 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 555).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). In other words, this "plausibility standard requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" *Francis*, 588 F.3d at 193 (quoting *Twombly*, 550 U.S. at 570). A plaintiff must, using the complaint, "articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief." *Francis*, 588 F.3d at 193 (quoting *Twombly*, 550 U.S. at 557). "Determining whether a complaint states [on its face] a plausible claim for relief [which can survive a motion to dismiss] will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## DISCUSSION

The Defendant has moved for dismissal based on Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Court will initially address the 12(b)(1) motion, because the 12(b)(6) challenge is moot if the Court lacks subject matter jurisdiction.

The Court must first address whether the United States has waived its sovereign immunity. [T]he Court has recognized the general principle that "the United States, as sovereign, 'is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit. *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981) (citations and quotations omitted). The FTCA provides for a limited waiver of the United States' sovereign immunity and grants the federal courts jurisdiction over actions for damages

arising from the acts or omissions of agents or employees of the United States.  28 U.S.C. §

1346(b).  *Also see* 28 U.S.C. § 2674.  The United States is liable only to the extent that, in the

same circumstances, the applicable local law would hold a private person responsible.  *Id*.  *Also*

*see United States v. Olson* 546 U.S. 43, 45-48 (2005).  As such, the Plaintiff must show that West

Virginia law would impose liability on a private person in similar circumstances in order to bring

an FTCA claim.  *See* 28 U.S.C. § 1346(b)(1).  *Also see Olson* 546 U.S. at 44.  In other words,

the Plaintiff must prove that West Virginia law recognizes a claim against a private inspector for

negligent inspection of a mine.

The Fourth Circuit addressed this exact question of law in the per curiam opinion of *Bragg*

*v. United States,* 528 F. App'x 282 (4th Cir. 2013) (unpublished).  In *Bragg*, as in this case, the

Plaintiff brought a negligence and wrongful death suit under the FTCA alleging that MSHA was

negligent in their safety inspections of a mine.  *Id*.  The district court dismissed the action

because in its view, under West Virginia law, "a private person under like circumstances to those

alleged against the United States would not be liable in a negligence action for the wrongful death

of the miners."  *Id*.  Since the appeal turned on a question of West Virginia law, the Fourth Circuit

certified the following question to the Supreme Court of Appeals of West Virginia: "whether a

private party conducting inspections of a mine and mine operator for compliance with mine safety

regulations is liable for the wrongful death of a miner resulting from the private party's negligent

inspection?"  *Id*.  The Fourth Circuit noted in response to their question that:

> The Supreme Court of Appeals of West Virginia
> unambiguously answered our question in the affirmative.  That
> court stated that factors including "the likelihood of injury, the
> magnitude of the burden of guarding against it, and the
> consequences of placing that burden" on a defendant "weigh in
> favor of finding that a safety inspector owes a duty of care to the

employees whose safety the inspection is intended to secure." Bragg v. United States, 230 W.Va. 532, 741 S.E.2d 90, 99–100 (2013) (quotation marks omitted). The court plainly "h[e]ld that a private inspector who inspects a work premises for the purpose of furthering the safety of employees who work on said premises owes a duty of care to those employees to conduct inspections with ordinary skill, care, and diligence commensurate with that rendered by members of his or her profession." Id.

*Id*. at 283. Thus, it is clear that West Virginia law recognizes a claim against a private inspector for negligent inspection of a mine, and the limited waiver of the United States' sovereign immunity under the FTCA gives this Court jurisdiction over this matter.

However, the Court's inquiry does not end there. Congress created exceptions to § 1346(b) under 28 U.S.C. § 2680, which qualified the United States' waiver of sovereign immunity under the FTCA. "If one of those exceptions applies, the bar of sovereign immunity remains." *Dolan v. U.S. Postal Serv*., 546 U.S. 481, 485 (2006). One such exception is the discretionary function exception, which states that the limited waiver of sovereign immunity provided by § 1346(b) does not apply to:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a *discretionary function or duty* on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (emphasis added). The statute is silent on what "discretionary function or duty" is and "the exception has a fluid quality that escapes particular confinement." *Fleming v. United States*, 69 F.Supp.2d 837, 840 (W.D. Va. 1999) (quoting *Williams v. United States*, 50 F.3d 299, 309 (4th Cir. 1995). However, the United States Supreme Court has mandated a two-part test to be used to determine whether the exception bars a suit under the FTCA. *See United States*

*v. Gaubert*, 499 U.S. 315, 322–23 (1991). First, the court must determine if the government employee's act in question was discretionary or mandatory. *Id.* at 322. Second, if the act was discretionary, then it must be determined if the employee's discretion was based on considerations of governmental policy. *Id.* at 323. The Plaintiff bears the burden of demonstrating that the discretionary function exception does not apply. If that burden is not met, the Court must dismiss the case. *See Wood v. United States*, 845 F.3d 123, 127 (4th Cir. 2017).

In its motion to dismiss, the Defendant contends that both prongs of the test set forth in *Gaubert* are satisfied. First, it argues that many of the claims alleged in the complaint are not violations of mandatory duties. It notes that the Plaintiff did not dispute that MSHA conducted the required six regular quarterly inspections of the Mine and that the inspectors inspected the working areas of the mines as determined by the active operation of the Mine at the time of the inspections. To the extent that an area of the mine was not inspected, the Defendant contends that the mine operator failed to maintain current maps and information reflecting all active working sections of the mine. The Amended Complaint alleges the following specific mandatory violations of inspection procedures:

> 19. The findings of the MSHA investigation were breathtaking. Inspectors from MSHA violated certain mandatory regulations which created, maintained, or contributed to unsafe working conditions including, but not limited to, those violations identified in the March 6, 2012 Internal Review of MSHA's actions at [the Mine], which is incorporated by reference. A copy of the MSHA Internal Review is attached as Exhibit C.

> 20. Plaintiff alleges, and according to the MSHA Internal Review:

> A. In violation of the General Coal Mine inspection procedures and Inspection Tracking System Handbook, some areas of the Mine were not inspected during each of the six regular inspections reviewed.

B. The inspector who traveled to EP-LW3 on March 10, 2010 took [only] two of the three air readings required for that location.

C. In violation of Standard Operating Procedures and District 4 guidance, ROE ("right of entry") trainees conducted inspection activity, apart from ARs (Authorized Representatives of the Secretary), for portions of five of the six regular inspections at [the Mine] during the review period. Some of the inspection activities conducted by ROE trainees involved areas mandated by the Mine Act to be inspected by ARs, such as air courses and seals. A ROE trainee inspected some of the 1 North Longwall face equipment on March 15, 2010, while the AR remained on the headgate side of the longwall panel. Also during the review period, ROE trainees conducted inspections (apart from ARs) of seals, return air courses, a conveyor belt entry, a shop, surface equipment, SCSRs, and explosives storage magazines.

D. For each regular inspection reviewed by the Internal Review team, and in violation of Uniform Mine File Procedures Handbook, one or more inspectors or specialists did not review or did not document reviewing the UMF (Uniform Mine File) prior to inspecting at [the Mine].

E. In violation of the General Coal Mine Inspection Procedures and Inspection Tracking System Handbook, an inspector arrived at [the Mine] on a Saturday after the start of the day shift but did not travel underground during the first regular inspection of fiscal 2009. Another MSHA inspector did not visit the Mine until 19 days later, when the lead inspector arrived before the start of the shift and traveled underground with the mantrip. During the first regular inspection of fiscal 2010, an electrical specialist and a health specialist arrived at the Mine after the shift's starting time on the first day of the inspection to inspect the AMS (atmospheric monitoring system) and respirable dust parameters.

F. Inspectors violated the provisions of the General Coal Mine Inspection Procedures and Inspection Tracking System Handbook requiring mine visits on all working shifts during one of the six regular inspections reviewed. During the third regular inspection for fiscal 2009, inspectors did not inspect the Mine on evening shift.

G. In violation of the General Coal Mine Inspection Procedures and Inspection Tracking System Handbook inspectors did not

consistently conduct or document conducting the following activities:

i. Inspect fire protection equipment, first aid equipment, potable water, escapeway maps, and sanitary facilities.

ii. Hold health and safety discussions with miners on every working section. During three inspections, inspectors did not conduct or document conducting health and safety discussions on any of the sections. During the other three inspections, inspectors documented conducting these discussions underground on one to four of the working sections. Two inspectors interviewed indicated that they held their health and safety discussions with miners on the surface.

iii. Check for imminent dangers in working places every time they inspected a working section. Inspectors sometimes went to a section to terminate a citation(s) or to inspect equipment or other items on the section, but they did not check for imminent dangers as directed.

iv. Observe or document observing the entire mining cycle on some working sections during the first five regular inspections of the review period.

v. Document the location of the last open crosscut on the working sections that had advanced since their last inspection visit.

vi. Inspect all SCSRs carried or stored on working sections, as follows:

a. Inspect any SCSRs (self-contained self-rescue device) carried by miners on each working section during two of the six inspections. Only some of the SCSRs carried by miners were checked during two other inspections. During one inspection some SCSRs were inspected by a ROE trainee while he was apart from the AR.

b. Inspect the SCSRs stored on the longwall section during the fourth regular inspection for fiscal 2009.

c. Consistently document the manufacturer, model, and serial numbers of SCSRs on working sections.

H. In violation of the General Coal Mine Inspection Procedures and Inspection Tracking System Handbook, Inspectors did not travel with or document traveling with at least one preshift, one on-shift, and one weekly examiner during three of the six inspections in the review period. During the first regular inspection for fiscal 2009, inspectors did not travel with or document traveling with a preshift examiner. During the fourth regular inspection for fiscal 2009, inspectors did not document traveling with a preshift or weekly examiner. During the first regular inspection for fiscal 2010, inspectors did not document traveling with an on-shift examiner. While inspectors traveled areas of the Mine with Operator representatives, the inspectors did not document that these persons were conducting examinations or that they were mine examiners. Inspectors also did not consistently document the examiners' names in their inspection notes as required by the Handbook. During the first regular inspection for fiscal 2009, an inspector did not document the name of the on-shift examiner he accompanied. During the second regular inspection for fiscal 2009, inspectors did not document the names of any of the examiners they accompanied. During the first regular inspection of fiscal 2010, an inspector did not document the name of the preshift examiner he accompanied. The inspector traveling with a preshift examiner during the second regular inspection for fiscal 2010 did not document the examiner's name.

I. Inspectors did not always follow the instructions related to gas detectors in the General Coal Mine Inspection Procedures and Inspection Tracking System Handbook. District 4 personnel did not inspect a representative number of gas detectors in use at [the Mine]. During the 6 regular inspections of the review period, inspectors documented examining a total of 13 gas detectors at the Mine. Only 3 of the 13 gas detectors examined were being used by mine examiners. Inspectors documented examining four gas detectors during one regular inspection, the most of any inspection in the review period. For the second regular inspection of fiscal 2010, there was no documentation to indicate that any detectors were examined. Inspectors did not always document a means to identify gas detectors, such as the Operator's identification number or manufacturer's serial number.

J. Inspectors did not document that they examined all required records and postings during the other four regular inspections in the review period.  Only a few of the individual records or postings were listed in the notes as having been inspected, as directed.   Some inspectors documented in the ITS (inspection tracking system) that they examined several records and postings but did not document doing so in their notes.

K. In violation of the Handbook directive to check records back to the end of the previous regular inspection, inspectors were not consistent in their review of past records.   Although the Handbook directed them to check records back to the end of the previous regular inspection, inspectors stated they would check the record books but only back to the start of the current inspection, to the beginning of the current record book, or for the past few days or weeks.

L. District 4 inspectors did not inspect the [the Mine] explosives storage facilities during the third regular inspection for fiscal 2009.  Inspectors did not complete and submit ATF (Bureau of Alcohol, Tobacco and Firearms) Form F 5030.5 during any of the six regular inspections as directed by the Handbook.

M. Inspectors did not consistently inspect or document inspecting some surface items, areas, and equipment in either in their notes or in the listing provided in the General Coal Mine Inspection Procedures and Inspection Tracking System Handbook.

N. In violation of the General Coal Mine Inspection Procedures and Inspection Tracking System Handbook and other Agency directives, inspectors did not always comply with the instructions for documenting in their notes their inspection activities and the areas and equipment they inspected during each of the six regular inspections.   Required information that inspectors did not always document in their inspection notes includes the following:

> i. Serial numbers, manufacturer, or model of SCSRs examined
> ii. Serial or company numbers of equipment inspected
> iii. The manufacturer and model of the Atmospheric Monitoring System installed in the longwall belt entry after the longwall began production in September 2009

iv. Number of seals in each set or the methane and oxygen readings in the entry nearest the seals after the air has passed the seals

v. Names of mine examiners accompanied

vi. Mine records or postings examined

vii. Some inspection activities and inspection of areas/equipment on working sections and surface areas

viii. Checking for imminent dangers when inspecting the working places on each working section

ix. A statement such as "No Violations Observed" or "NVO" after they inspected an area or item and did not observe any violations.

O. Inspectors sometimes did not include a statement such as "No Imminent Dangers Observed" or "NIDO" when they inspected working places and did not observe an imminent danger. Interviews indicated inspectors generally were aware of the requirements in the General Coal Mine Inspection Procedures and Inspection Tracking System Handbook to document imminent danger checks and to include statements when no violations were observed; however, they did not consistently comply with the procedures.

P. Many pages of notes were not dated as required. Some notes did not have any dates, while other notes listed incorrect dates. The General Information Cover Sheets for three of the six regular inspections were not completed as directed by the Handbook or contained errors. Three of the Cover Sheets had missing or incorrect dates, two had other missing information, and one had an incorrect event number. The Daily Cover Sheet for three days also included the incorrect event number. Inspectors rarely listed shift and shift type on the Daily Cover Sheet to show the shift during which they were inspecting.

Q. The General Coal Mine Inspection Procedures and Inspection Tracking System Handbook directs inspectors to document certain inspection activities in the appropriate section of the ITS. Some areas and equipment inspected were recorded in the notes but not in the ITS, or alternatively, recorded in the ITS but not in the notes. Sometimes, the serial or company number recorded in the notes did not match what was recorded in the ITS.

R. Supervisors failed to identify and document many of the shortcomings found by the Internal Review team, including that the

Mine had not been inspected in its entirety during any of the six regular inspections.

S. For the first regular inspection of fiscal 2009, and in violation of the Coal Mine Safety and Health Supervisor's Handbook, the supervisor did not complete the review of any complete set of the daily inspection notes from [the Mine] until 28 days after the end of the inspection quarter, the same day that he certified the inspection as complete. For the first regular inspection in fiscal 2010, review of inspection notes covering four days was not completed until 20 days into the next quarter, and inspection notes covering two days of this inspection were not initialed as reviewed by the supervisor. By the time these notes were reviewed, the next regular inspections had begun, so the previous inspections could not be reopened for corrective action.

Amended Compl. ¶ 19-20. The Defendant dismisses these allegations and argues that the Plaintiff merely listed the violations issued to the operators for violation of mandatory safety standards.

The Court finds that the Amended Complaint sufficiently pleads that the MSHA employees were negligent in following mandatory, non-discretionary statutes, regulations, and policies. Importantly, this Court can consider evidence outside the pleadings without converting the 12(b)(1) proceeding to one for summary judgment. *Evans* 166 F.3d at 647. A review of the Mine Safety & Health Administration's Internal Review (hereinafter "MSHA IR") reveals that "[s]ome areas of the Mine were not inspected *as directed* by the General Coal Mine Inspection Procedures and Inspection Tracking System Handbook during each of the six regular inspections reviewed." (MSHA IR, Pg. 15) (emphasis added). Additionally, the report notes that inspector trainees "are not given credentials as Authorized Representatives of the Secretary (ARs) to inspect mines until they are deemed to be qualified by the District Manager to conduct inspections," yet these trainees conducted inspections. *Id*. at 16.

The Defendant relies heavily on *Estate of Bernaldes v. United States*, 877 F. Supp. 301 (W.D. Va. 1995), *aff'd*, 81 F.3d 428 (4th Cir. 1996), *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984), *Holbrook v. United States*, 673 F.3d 341 (4th Cir. 2012), and *Indem. Ins. Co. of N. Am. v. United States*, 569 F.3d 175 (4th Cir. 2009), to support the proposition that alleged violations of inspection procedures are inherently discretionary, and therefore shielded by the discretionary function exception. The Court can readily distinguish this case from the line of cases offered by the Defendant.

In *Bernaldes*, a miner was killed when he fell down an uncovered chute. 81 F.3d 428 at 430. The miner's estate alleged that the United States was liable under the FTCA because an MSHA inspection of the mine *failed to cite the mine for any violations* which caused the miner's death. *Id*. In *Bernaldes*, the Plaintiff argued that "MSHA inspectors failed to cite [the mine operator] for the lack of a grate, railing, or safety harness in the coal shed; inadequate lighting; and inadequate communication equipment among personnel working at the mine." *Id*. The Fourth Circuit affirmed the lower court's application of the discretionary function exception to MSHA's inspection of the mine in *Bernaldes*. *Id*. In doing so, the Fourth Circuit noted "the court reasoned that the inspectors' decisions as to when danger is great enough to require the implementation of safety measures are grounded in the policy of MSHA—protecting the miners' health and safety within the mine operators' financial constraints." *Id*. The Court indicated that the regulations were not sufficiently specific to be considered mandatory and that there was choice or judgment involved in determining whether lighting was sufficient or if there is such a danger of falling that belts and lines must be used or if there are hazardous conditions such that a miner should not work alone. Unlike the inspectors in *Bernaldes*, who were found to have discretion in determining

where there was a sufficient "danger of falling," the Plaintiff in this case alleges that the violations in question are beyond the scope of discretion and run afoul of required procedures when conducting an inspection.

In *United States v. Varig Airlines,* the Supreme Court held that the discretionary function exception barred a suit because FAA inspectors were "specifically empowered" to spot check aircrafts under construction for compliance with FAA regulations. 467 U.S. at 820. In doing so, the Court reasoned that:

> Here, the FAA has determined that a program of "spot-checking" manufacturers' compliance with minimum safety standards best accommodates the goal of air transportation safety and the reality of finite agency resources. Judicial intervention in such decisionmaking through private tort suits would require the courts to "second-guess" the political, social, and economic judgments of an agency exercising its regulatory function. It was precisely this sort of judicial intervention in policymaking that the discretionary function exception was designed to prevent. It follows that the acts of FAA employees in executing the "spot-check" program in accordance with agency directives are protected by the discretionary function exception as well.

*Id*. Unlike *Varig,* this case does not involve second guessing *how* inspections are conducted or how the agency used its discretion (i.e. "spot checking"). This Plaintiff alleges the Defendant failed to follow the required procedures which govern the inspections. Clearly, the Plaintiff has alleged that the Defendant did not retain discretion in where, when, and the manner in which it conducted certain inspections.

In *Holbrook v. United States,* an inspector made the decision to certify the airworthiness of an aircraft under 14 C.F.R. § 21.183(c) governing imported aircraft, rather than under 14 C.F.R. § 21.183(d), which governed "other" aircraft. 673 F.3d at 346. The Plaintiff brought suit against the United States under the FTCA, alleging that he suffered financial harm as a result of the FAA's

negligence in issuing an airworthiness certificate under section (c) as opposed to section (d). *Id.* at 343. The district court found that the plain language of the regulation indicated that the inspector accurately assessed the airworthiness of the aircraft. *Id.* In that case, the plaintiff cited guidance from an FAA order which established that the inspector should have relied on § 21.183(d). *Id.* at 347. The Fourth Circuit affirmed the district court's ruling dismissing the case for lack of jurisdiction based on the discretionary function exception. The appellate court noted that each of the two regulations were potentially applicable and the inspector made a judgment call about which one to follow. In doing so, he exercised his discretion and was protected by the discretionary function exception, because "if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies." *Id* at 346 (quoting *Gaubert*, 499 U.S. at 324). In dicta, the Fourth Circuit further opined:

> What is more, the Order's internal guidance to FAA employees is insufficient to establish a mandatory requirement such that the exercise of discretion was removed from the task at hand. If select passages from a lengthy and complex order could serve as the basis for government tort liability, the FAA would be hobbled by the specter of litigation as it worked to promote aircraft safety. The price of circulating internal guidance should not be an exponential increase in exposure to a tort suit.

*Id.* at 347. In the present case, there is no conflicting guidance that the inspectors relied on in their inspection of the mine. In *Holbrook*, the inspector made a choice to rely on one regulation when another may have also been applicable. This scenario squarely falls within the purview of the discretionary function exception, since the inspector was required to use discretion in determining which regulation best applied. Based on this Court's review of the facts pled in the Amended Complaint, the MSHA IR, and the Defendant's legal memorandum in the present case,

there does not appear to be any conflicting guidance relied on by the inspectors when allegedly choosing not to follow mandatory inspection procedures.

Lastly, the Court can easily distinguish the facts in *Indem. Ins. Co. of N. Am. v. United States*, 569 F.3d 175 (4th Cir. 2009), from this case. In that case, the owners and operators of a double pontoon vessel sued the United States seeking to recover damages they had paid to settle personal injury and death claims resulting from the capsizing of the vessel. As plaintiffs, the owners and operators claimed that the United States Coast Guard had certified the vessel to carry no more than twenty-five passengers when, if the stability proof test had been performed correctly, the vessel would have been certified to carry no more than fifteen passengers. The district court dismissed the action based on the discretionary function exception and the Fourth Circuit affirmed. The Marine Safety Manual in question in *Indem. Ins. Co.* "outlined recommended procedures" and a "recommended testing methodology" for conducting the stability proof test. *Id.* at 180. There was no mandatory language set forth in the manual of how the test was to be conducted. Accordingly, the Fourth Circuit held that the discretionary function exception was applicable. *Id*. 181-2. Here, the Plaintiff alleges that the Defendant did not follow mandatory procedures for inspecting the mine. Moreover, the Defendant does not argue that the alleged procedures in question were recommendations. *Indem. Ins. Co.,* therefore, is not instructive.

Based on a review of the Amended Complaint and the MSHA IR, for the purpose of analyzing this 12(b)(1) motion, the Court finds that the allegations pled are based on mandatory requirements which are not discretionary in nature. Therefore, the Court does not need to reach the second part of the *Gaubert* test.

To the extent the Defendant contests factual allegations which go to the merits of Plaintiff's claims, to support the argument that the Court should dismiss this matter based on subject matter jurisdiction, the Court finds that those attacks are premature:

> [A]n FTCA plaintiff facing an indirect attack on the merits—by way of a Rule 12(b)(1) motion—deserves greater procedural protection than that afforded by a typical Rule 12(b)(1) motion . . . we are unable to identify any valid reason for distinguishing this type of FTCA claim—with intertwined factual questions on jurisdictional and merits issues—from other tort claims with intertwined factual issues. Thus . . . district court should assume jurisdiction and assess the merits of the claim when the relevant facts—for jurisdictional and merits purposes—are inextricably intertwined."

*Kerns v. United States*, 585 F.3d 187, 192-3 (4th Cir. 2009).

Finally, with respect to its 12(b)(6) motion, the Defendant argues that federal law does not recognize a private right of action for a tort claim based on alleged violations of the Mine Act, and that as a matter of public policy, the Court should not permit the suit to move forward. (Memorandum in Support of the Mot. of the U.S. to Dismiss pg. 5 n2). Specifically, the Defendant argues the primary responsibility for safety in the mine remains with the mine operator, not MSHA and that therefore, MSHA is not to be considered an insurer for mine safety. *Id.* The one-count complaint relies exclusively on West Virginia negligence law and West Virginia's Wrongful Death Act, W. Va. Code § 55-7-6(c)(1) and (2). As such, because the Plaintiff does not rely on the Mine Act for relief, the Court need not address the merits of this argument or the alleged policy concerns raised in the footnote.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the *Motion to Amend Complaint, Instanter* (Document 17) be **GRANTED** and the *Amended*

*Complaint* (Document 17) be **FILED,** and the *Motion of the United States to Dismiss this Civil Action* (Document 7) be **DENIED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:     March 19, 2019

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA